

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

## NO. 02-11-00209-CV

IN THE INTEREST OF A.B. AND
H.B., CHILDREN

----------

FROM THE 322ND DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

In five points, Appellant D.B. (Father) appeals the trial court's order terminating his parental rights to his children, A.B. and H.B. Because we hold that the evidence supporting the endangerment findings remains insufficient, we reverse the trial court's judgment terminating Father's parental rights and remand this case to the trial court for another new trial.

---

[1]See Tex. R. App. P. 47.4.

## I.  Procedural and Factual Background

## A.  Procedural Background

This is the second time that this matter has been before our court.[2]

As we detailed in our first opinion, A.B. and H.B. were placed with family members in September 2007 after then fifteen-month-old H.B., weighing only fifteen pounds, was admitted to the hospital; she had suffered a seizure.  The Texas Department of Family and Protective Services (TDFPS) concluded that she had been physically neglected.  The children remained in that voluntary family placement about nine months before TDFPS returned them to Father's care.[3]  About a month after reunification, TDFPS removed the children from Father after a doctor opined that A.B. had injuries that were not accidental, and TDFPS placed the children with an unrelated foster family.[4]  TDFPS filed its petition for termination the next day. About seven months later, the children were placed with a second foster family, G.H. and J.H.[5]

In June 2009, after a bench trial, Father's parental rights were terminated for the first time.  The trial court found by clear and convincing evidence that Father had knowingly placed or knowingly allowed the children to remain in conditions or

---

[2]*See In re A.B.*, No. 2-09-00215-CV, 2010 WL 2977709 (Tex. App.—Fort Worth July 29, 2010, no pet.) (mem. op.).

[3]*See id.* at *4, 7.

[4]*See id.* at *13.

[5]*See id.* at *28.

surroundings that endangered their physical or emotional well-being, that he had engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children's physical or emotional well-being, and that termination of the parent-child relationship with Father was in the children's best interest.[6] S.B.'s (Mother's) rights were also terminated, but she did not appeal that decision.

Father appealed from that judgment and challenged the legal and factual sufficiency of both endangerment findings and of the best interest finding.[7] In July 2010, this court reversed the judgment and remanded the case to the trial court.[8] In doing so, we overruled Father's legal sufficiency challenges, sustained his challenge to the factual sufficiency of the evidence supporting the endangerment findings, and did not reach his challenge to the factual sufficiency of the evidence supporting the best interest finding.[9] No one petitioned for review of our decision.

Father's parental rights were terminated for a second time in June 2011 when a jury made the same endangerment and best interest findings that the trial court had made in the first trial. This appeal followed.

---

[6]*See id.* at *32.

[7]*See id.* at *1.

[8]*See id.* at *44.

[9]*See id.* at *36, 40–42.

3

## B. Factual Background

Because our previous opinion set forth in great detail the evidence from the first trial,[10] this section of our opinion will set forth additional evidence admitted in the second trial—relevant evidence from new exhibits, relevant testimony from new witnesses, and new testimony from repeat witnesses.

### 1. New Exhibits

#### a. Family Assessment Summary

TDFPS offered and the trial court admitted into evidence a family assessment summary completed by the Missouri Department of Social Services (MDSS). This assessment summary pertains to a December 2005 investigation that MDSS had conducted into the living conditions that Mother and Father had provided for A.B. while living in Missouri. This summary indicates that someone had reported that A.B.'s living conditions in the family's home were unsanitary, hazardous, and immediately threatening to A.B. due to a lack of heat and to the presence of dog feces, dirty clothes, and trash everywhere.

The assessment summary confirms this report in part and refutes it in part. Some boxes checked on the summary indicate that the living conditions were hazardous and immediately threatening, that they needed improvement, and that someone reported poor hygiene and dirty clothes. However, other checked boxes indicate that medical and dental needs were being met, that the living conditions

---

[10] *See id.* at *1–32.

were clean, orderly, and sanitary, and that there were no observed infestations. The assessment summary further provides that the family was staying with friends until the heat in their own home was restored.

An MDSS representative told Father that he and Mother had made the appropriate provisions to provide for A.B. by staying in trailers that met minimum standards and that they were free to move to Texas. The assessment summary states that services were needed but that the family declined them and moved out of the state. The summary also provides that MDSS had conducted a prior assessment for abrasions and for unsanitary living conditions in June 2005 and had concluded that services were needed.

### b. H.B.'s Medical Records from the Bedford Fire Department

TDFPS offered and the trial court admitted into evidence medical records showing that H.B. had a possible seizure ten minutes prior to someone calling 9-1-1 on September 29, 2007. The sequence chart indicates that H.B. was found awake and alert in Mother's arms, that H.B.'s pupils were equal and reactive, and that wheezes were detected in her upper lobes. The narrative summarizes Mother's statements to EMS, including that A.B. had hit H.B. in the head with a toy four days prior and that H.B.'s gasps for air had prompted Mother to call 9-1-1. The report outlines the responder's medical observations, including an abrasion on H.B.'s forehead, and notes that the hospital staff was told to notify TDFPS for a possible investigation.

### c. Project RAPP Disposition Form

Father offered and the trial court admitted into evidence a Project RAPP Disposition Form, indicating that a psychiatrist, Dr. Robert Mims, evaluated Father in August 2009 at the Project RAPP offices. We take judicial notice of the fact that Project RAPP is a Tarrant County Mental Health Mental Retardation (MHMR) program that seeks to reduce recidivism through psychiatric and psychosocial rehabilitation.[11] The form further indicates that Dr. Mims concluded that Father did not have signs or symptoms of mental illness and did not require services from Project RAPP.

### d. Order Terminating Father's Deferred Adjudication

Father offered and the trial court admitted into evidence an October 2009 order terminating his deferred adjudication community supervision for injury to a child (A.B.). In this order, the trial court presiding over the criminal case notes that Father had satisfactorily completed nine months of the two-year deferred adjudication community supervision period and had satisfactorily fulfilled his terms and conditions of community supervision. The order discharges Father from further community supervision, allows Father to withdraw his plea, and dismisses the criminal case. The order further releases Father "from all penalties and disabilities resulting from the offense or crime of which he has been convicted or [to] which he has pleaded guilty, as provided by law."

---

[11]*See* Tex. R. Evid. 201(b).

6

### e. Order of Deferred Adjudication for Sammie Jo Rains

TDFPS offered and the trial court admitted into evidence the March 2010 order of deferred adjudication for Rains's conviction of bodily injury to an elderly person. Father testified that at the time of trial, he and Rains were living together, and she was expecting a child that might be his.

### f. Images

A.B. and H.B.'s foster parents, intervenors G.H. and J.H., offered and the trial court admitted into evidence two exhibits relating to Father's involvement with adult websites. The first exhibit is a 2010 image of Father's Myspace webpage that encourages viewers to create a member profile on an adult website at a link provided. The other exhibit is an image of Father's "adultspace.com" profile page, which contains nude photographs. The image indicates that Father has not logged in since June 2008.

Additionally, the trial court admitted into evidence several photographs that G.H. and J.H. had taken, including photographs of the children's rooms, of the children dressed up in costumes, and of the children lying or walking in fields of bluebonnets.

### g. Lease Violation and Pest Control Records

The children's attorney ad litem offered and the trial court admitted into evidence notices of Father's lease violations as well as pest control records from Father's apartment. The notices, dated September 2009 and September 2010, report violations for unhealthy and unsanitary living conditions and poor

housekeeping. The first comprehensible pest control record, dated September 28, 2010, indicates that Father's apartment was infested with roaches and that a cleanout would be scheduled for the following week. The next record, dated October 5, 2010, indicates that Father did not comply with instructions for cleanout treatment and that the apartment was thoroughly infested with roaches. The next record, dated October 19, 2010, includes an entry that the roaches were "Bad!!" in Father's apartment. The final record, dated November 16, 2010, indicates that Father's apartment had a heavy roach infestation. All four records indicate that at least one other apartment in the complex was being treated on each of those days.

### h. 2011 Psychological Evaluation

TDFPS offered and the trial court admitted into evidence Dr. Parnell Ryan's January 2011 psychological evaluation of Father. According to the report, Dr. Ryan's diagnostic impressions were that Father has bipolar disorder not otherwise specified (NOS) in partial sustained remission, attention-deficit/hyperactivity disorder NOS, adjustment disorder with depressive mood, and chronic motor tic disorder and was abused as a child. The report indicates that Father told Dr. Ryan that he did not take prescription medications, and Father denied that he ever used illegal drugs or alcohol. According to the report, Father had been in foster homes as a child, but at the time of the evaluation, he described his relationship with his mother as "[o]kay" and with his siblings as "good." Father's greatest fear at the time was losing his children to TDFPS, and he regretted cursing at and getting angry with TDFPS personnel.

Dr. Ryan states in his report that Father's profile "suggests someone who has difficulty understanding how his problematic behaviors impact others" but that Father denied needing to change anything about himself. Dr. Ryan recommended that Father participate in TDFPS services, attend counseling, and obtain medical evaluations for possible medication management of his attention difficulties.

### 2. New Witnesses

#### a. Jennifer Porter

Porter testified that she was a TDFPS investigator for A.B. and H.B.'s case and that she was assigned on October 1, 2007, when H.B. was still in the hospital. She testified that H.B. was discharged from the hospital around October 8, 2007, and that Father was "up there a lot." She testified that Father was cooperative with her.

Porter testified that she attempted the first home visit on October 9, 2007, but that Father was not home. She added that she heard several dogs barking inside, that there was a cat sitting in the window, and that there was a strong odor of animal feces coming from inside the apartment. When Porter spoke to Father the next day, he told her that he had contacted the city pound because he did not have the means or ability without a car to take away the four dogs and four cats that Mother had brought to the apartment. Porter testified that when she visited Father's apartment on October 10, 2007, there was a strong odor of animal feces and animal urine, stains and animal excrement were on the floor, the walls were ripped up, and bugs were visible in the home, including in the refrigerator and the freezer. She testified

9

that she made the finding of "reason to believe" for physical neglect, and she testified that the condition of Father's apartment could be a dangerous environment for young children who crawl on the floor and put things in their mouths. Porter testified that she did not know the condition of the apartment during the time that Father may have been caring for the children and that she did not have pictures of the apartment with her.

Porter also testified that Father told her that after he and Mother separated, he would watch the children at his home from 3:00 p.m. until midnight while Mother worked. Porter further testified that developmental delays could impact a child's well-being for the rest of her life without proper treatment.

### b. Lamorra Cornelius

Cornelius, a TDFPS investigator for the emergency response unit, testified that when she was a TDFPS caseworker, her job was to work with parents to help them get their children back. She testified that when she first met with Father in October 2007, the children had been placed with family members. She testified that when she walked into his apartment that month, she felt fleas biting her legs and noticed a strong odor, stains on the carpet, roaches in the kitchen, and black water and dirty dishes in the dishwasher. However, Cornelius did not take any pictures of these conditions.

Cornelius testified that each time Father would come to visits at the TDFPS office, he would yell and scream at her, make demands, and ask when he was going to get his children back. She said that this behavior occurred in the children's

presence and that this concerned her because it was not a wise use of his time with his children. Cornelius testified that although Father was initially noncompliant, he worked on all of his services from November 2007 to February 2008 and that by March 2008, TDFPS made a decision to allow Father to have visits in his home.

Cornelius testified that when she visited Father's apartment on April 2, 2008, it was clean. She said that she did not notice any odors or stains but that she told Father that he needed to keep more food in the house. Cornelius also testified that after a four-hour visit in April, Father returned the children to TDFPS hungry and dirty from being at the park. She testified that he also returned the children hungry after the next four-hour visit and that he got angry with her when she discussed his failure to feed the children. She explained that Father had difficulty obtaining food because the family members with whom the children had been placed had the food stamps and that Father had trouble getting the food stamps transferred back to him. Cornelius testified that Father had food for the children by the next visit because a friend gave him food.

Cornelius testified that when Father returned the children from the next two visits, one overnight visit in May 2008 and one in June 2008, the children did not appear to have been bathed. But Cornelius testified that despite her concerns regarding the children being fed and being returned dirty, the children were placed back with Father on June 10, 2008.

Cornelius testified that she visited Father and the children on June 17, 2008, and that there was a rotten odor in the air and stains, trash, and "[f]ood, just kind of

11

old food," on the floor but no food to eat in the home. When she opened the bedroom door, she found the children lying in bed. They did not respond to her, which she testified was unusual. She testified that she visited again on June 27, 2008, and that the conditions had worsened—more food on the floor, unclean dishes in the sink, and a rotten odor—except that there was some edible food in the home. The next time that she saw the children was when they were taken to the hospital due to A.B.'s injuries on July 8, 2008. She testified that the children were placed in foster care that night and that she believed that Father had placed the children in a dangerous environment.

### c. Dr. Ryan

Dr. Ryan, a licensed psychologist and professional counselor, testified that he conducted two psychological evaluations of Father and one diagnostic consultation, all of which were admitted into evidence in the second trial. The consultation and the first evaluation were also admitted into evidence in the first trial.

Dr. Ryan testified that the global assessment of functioning (GAF) assesses how well a person is doing in life and that a person with a GAF under 50 is usually hospitalized. Dr. Ryan testified that Father's GAF was 75 in 2007, 55 in 2009, and 55 in 2011. He testified that he diagnosed Father with attention deficit hyperactivity disorder NOS, adjustment disorder with depressive mood, bipolar disorder NOS, and chronic motor tick disorder but that he did not see any sign of psychosis or paranoia. Dr. Ryan also testified that Father did not report being on any medication

12

in 2007, 2009, or 2011 and that a psychiatrist's report in 2009 indicated that a referral for a pharmaceutical patient assistance program was not needed.

Dr. Ryan testified that Father was consistent in how he presented over the years. Dr. Ryan also testified that lacking insight into one's own behavior and how the behavior affects others is a problem in parenting children but that whether it is a dangerous situation—whether it endangers a child's emotional or physical well-being—depends on what the problematic behavior is. Dr. Ryan testified that Father's insight mildly improved by the last evaluation and that Father's problematic issues were the disorders with which Dr. Ryan had previously diagnosed him. Dr. Ryan testified that having bipolar disorder does not prevent someone from being a good parent and that Father did not present as a dangerous person. Dr. Ryan further testified that everyone has problematic behavior and that Father was able to control his behavior when he chose. Dr. Ryan also testified that an inability to control one's own behavior, for example, illegal drug use, coupled with lack of insight could endanger a child.

Dr. Ryan testified that Father denied needing to change anything and denied needing counseling but that Dr. Ryan believed that Father did need counseling because of his separation from his children. Dr. Ryan testified that he did not recommend that Father go to anger management classes. When asked whether Father would likely participate in services offered through TDFPS, Dr. Ryan said, "Possibly."

### d. Dr. Carl Shaw

Dr. Shaw, a physician at the emergency department of Cook Children's Hospital, testified that he examined A.B. on July 8, 2008, and that A.B. had several locations of bruising around his head. Shaw testified that x-rays detected no fractures and that A.B.'s injuries were not life-threatening but that they were not the type of injuries that a toddler would sustain by an accidental fall or successive falls within a short amount of time. Dr. Shaw testified that he wrote in his affidavit that A.B.'s injuries were likely consistent with physical abuse.

Dr. Shaw testified that A.B.'s skeletal survey showed no evidence of prior bone injuries. Dr. Shaw testified that in his affidavit, his answer to the question of whether he felt that the child would be in immediate danger of additional injury or at a substantial risk of harm if released to the parents was "[P]ossibly so." Dr. Shaw testified that he could not tell whether the injuries happened at one time or at different times.

### e. Bryan Knox

TDFPS investigator Knox testified that he began interacting with Father when TDFPS determined that Father and Cornelius had a lot of conflict. He testified that he went to Father's apartment on July 8, 2008, to investigate the possible abuse of A.B. Knox testified that another investigator and the police were also there. But according to Knox, Father refused to let anyone but Knox into the apartment, and Father called the police officers "pigs."

14

Knox testified that they all went to the hospital; that Father was "[a]ngry, angry, angry"; that Father told an officer to "suck his dick"; and that the children were present and heard Father say that. Knox told the jury that he had never seen a parent treat a police officer that way. He also testified that in domestic violence cases, it is detrimental to the children's well-being to observe the emotional abuse.

Knox further testified that from around April 2008 to June 2008, he had been inside Father's apartments. Knox testified that Cornelius was with him when he visited the first apartment, which was clean—no bugs, no mice, no smell, and nothing endangering to a child. Knox testified that Cornelius was not with him when he visited Father's second apartment, which Knox said was nothing more than messy. Knox said that he did not have a bad working relationship with Father and that he was a referee of sorts between Cornelius and Father.

### f. Val Trammell

Trammell, a TDFPS case aide, testified that she observed visits at the TDFPS office between Father and his children from October 2008 until June 2009 while the children lived with foster parents. She acknowledged that other visitation facilities permitted TDFPS workers to observe visitations through a mirror but that theirs was more intrusive and stressful for those being observed because the observers stood or sat in the doorway and were visible to those being observed.

Trammell testified that at virtually every visit, Father displayed a lot of anger toward TDFPS in front of his children at the beginning of the visit, said things that are not supposed to be said in front of children on a visit, and got loud on occasion.

She said that while this was going on, the children would get very quiet, look down, and move to the other side of the room as if they were trying to make themselves invisible. Trammell clarified that Father's anger was primarily directed at TDFPS and was never directed at the children. She said that TDFPS workers had to call the security guard at times but that when Father calmed down and played with the children, things went fairly well, and the children did not appear to be afraid of him. She also testified that Father did not act hostilely toward TDFPS on one occasion when his attorney and the attorney ad litem were present, showing her that Father had the ability to control his anger.

Trammell further testified that she would pick the children up from J.H. and G.H.'s home to take them to the TDFPS office visits, that J.H. and G.H.'s home was beautiful, and that she was surprised by how quickly the children had bonded with them.

### g. Melissa Reagan-Perez

Perez, a Tarrant County community supervision officer, testified that Father was on deferred adjudication community supervision from September 2008 to October 2009, at which point he was successfully discharged and the case was dismissed.

Perez noted that one community supervision condition had required that Father take medication, that Father was not initially compliant in this regard, that Father obtained a psychiatric evaluation in 2009, and that the psychiatrist did not recommend medication after that evaluation. Perez also noted that Father was

16

angry and agitated during most of his visits with her and that he would repeat a point continuously to make sure that it was heard but did not generally scream or yell. She testified that the community supervision department was only required to have two contacts with Father per month but that it had thirty contacts with him in June 2009. She explained that these contacts were mostly the police department, TDFPS, or other agencies calling the community supervision office and asking it to address the issue of Father contacting them too often.

Perez testified that from July 2009 to October 2009, Father's apartment was generally cluttered and very unclean but that the children were not living there during that time. She explained that fast food wrappers and containers were left out. Perez opined that Father's apartment was not an appropriate place for children to live "primarily because there [wa]s a very strong odor from the litter box." Perez testified that she also detected a litter box odor as well as human body odor and noticed that the apartment was cluttered when she visited Father's apartment in January 2011.

Perez testified that at the time of trial, Rains was on Perez's community supervision caseload for injury to the elderly and that Rains had previous charges of theft as a juvenile and of assault on the elderly. Perez testified that Rains, who was pregnant, moved in with Father in May 2010, moved out in September 2010, and then moved back in with Father in December 2010. Perez added that Rains identified Jeff Jones, who Perez believed lived with Father and Rains, as her boyfriend and identified Father as the father of her child. Perez further testified that

17

Rains had another child but did not have custody of that child. Because Perez had never seen Rains interact with children, Perez could not opine as to whether A.B. and H.B. would be safe around Rains.

### h. J.H.

J.H. testified about her previous experience with children, which included working in daycares and in preschools. She testified that she and her husband want to adopt A.B. and H.B. She also testified about her daily routine with the children, which includes playing with H.B. in the morning after G.H. takes A.B. to school, getting H.B. ready for pre-K, taking H.B. to pre-K, resting in the afternoon, picking the children up from school, working on homework and having snacks with them, letting them play, having dinner, bathing them every other day, and putting them to bed.

J.H. testified that she told A.B.'s psychologist that A.B. had a tendency to fall down and say that she and G.H. had pushed him. J.H. testified that Father had filed several reports with TDFPS regarding the couple's treatment of the children. She explained that these reports were disruptive because as a result of the reports, the children were interviewed at school, the children cried, and A.B. had temper tantrums. Finally, she testified that she had never called the police regarding Father but that G.H. had.

### i. Elaine Johnson

Johnson, a licensed professional counselor and children's play therapist, testified that she first saw the children in March 2009. She explained that she

evaluated them over a period of time in play therapy. She testified that when his foster parents brought him in, A.B. was tired, and his affect was "rather flat." She described his play as repetitive and purposeless but very cooperative. Johnson testified that H.B. was aloof and did not have a strong connection with anyone except A.B., to whom she was greatly attached, and that Johnson was still working with H.B. on empathy. Johnson testified that H.B. displayed unusual distress regarding potty training.

Johnson also testified that A.B. tried to bite J.H. on one occasion but that this was not unusual for children who have gone through some sort of trauma. She also said that A.B. hit J.H. and G.H. early on but that the trigger was not always known. She further testified that while the children played out fantasies, they sometimes said things out of the ordinary. She explained that A.B. said things about someone stealing children, "I don't want them dead," and "cutting their brains out." Johnson testified that she went a period of time without seeing the children but that in October 2010, A.B. was having trouble transitioning to going to school and that after expending his energy all day, he was sometimes too exhausted to eat when he got home. She testified that at the time of trial, they were working on modifying behavior so that the children will ask the foster parents for help when needed and to stop meltdowns before they occur.

Finally, Johnson testified that she was really impressed with J.H. and G.H., that they had a beautiful relationship with each other and with the children, and that the children call them "[M]ommy" and "[D]addy" and call Father their "other [D]addy."

19

### j. Joanna Letz

TDFPS caseworker Letz testified that she worked with children who had been put into foster care, with the foster parents, and with the birth parents. She explained that she had been the children's caseworker since August 2010 and had been working with Father since October 21, 2010. She testified that in order to consider placing children back with a parent, she must visit the parent's home. She testified that she went to Father's apartment on October 20, 2010, but that he was not there.

Letz testified that the first time that she saw Father was at the courthouse on October 21, 2010. She claimed that she had tried to introduce herself to him there but that he had told her that he could not speak to anyone without his attorney being present. She testified that she saw him next at the TDFPS office, where she met with Father and his attorney about Father's service plan. She said that even though Father had already completed counseling, parenting classes, anger management, and psychological examinations, she offered them again. She testified that Father agreed only to the completion of another psychological examination.

Letz testified that she went to Father's apartment again in January 2011. She stated that a man first opened the door, and then a woman opened the door and told Letz that she was not supposed to be there. Then Father told Letz that she could not come in without his attorney being present. Letz admitted that Father's attorney had indeed told her not to speak with Father without his attorney and that she believed that it was also "[s]upposed to be" TDFPS's policy. She went to Father's

home without contacting his lawyer because she believed that it was her "duty" and her "job."

Letz testified that she had seen J.H. and G.H.'s home many times and that it was inspirational to watch how they parent the children. She testified that the children had been with J.H. and G.H. for just over two years; that they had a loving relationship with the children; and that the children received love, nurturing, kindness, emotional support, security, and structure in J.H. and G.H.'s home.

Letz testified that TDFPS's permanency goal for Father and his children had been reunification in 2008 but that in October 2010, when she tried to visit Father's apartment, it was for Father's rights to be terminated and for the children to be adopted. Letz testified that in her opinion, it was in the children's best interest for Father's parental rights to be terminated.

### k. Sheryl Coaxum

Coaxum, assistant manager of the Cherry Hill Apartments, testified that Father's lease there began on June 9, 2008, and that he paid his rent on time. She testified that Father had lease violations in September and October 2010 for unsanitary living conditions, which were noticed by the pest control company. She testified that Father had requested that pest control treat his apartment but that on September 28, 2010, the pest control company personnel told Father that they would not treat his apartment until he cleaned it, especially the area behind the microwave where pest control found dead roaches. She testified that pest control could not treat Father's apartment on October 5 because Father had not complied

with instructions to clean it and that they visited Father's apartment twice after that. Coaxum also testified that maintenance employees would not fix Father's dishwasher in September 2010 until he cleaned the dirty floors. She testified that she had no record of a complaint or a lease violation for unsanitary living conditions during June and July 2008 while his children were living with him.

Coaxum further testified that Father told her that Rains was his girlfriend, that Rains had been living with him, and that Rains was pregnant with his child.

### l. Betty Williams

Williams, who resided in the Cherry Hill Apartments, the same apartment complex in which Father resided, testified that she had known Father for eleven or twelve months at the time of trial. She testified that Father would come over to her apartment to work on her computer. She described Father's temperament as "laid back" and testified that he would help her do anything that she could not do, that he was very respectful, and that she had never seen him get upset about anything or lose his temper. She testified that he seemed very concerned about his children.

### 3. New Testimony from Repeat Witnesses

#### a. Chris Conner

Conner, a paramedic with the Bedford Fire Department, offered essentially the same testimony that he had offered during the first trial.[12] However, instead of

---

[12] *See A.B.*, 2010 WL 2977709, at *4.

describing H.B. as appearing lethargic,[13] he testified in the second trial that she appeared normal and did not exhibit signs of having had a seizure.

### b.  Janice Barker

As an employee of Volunteers of America, Barker taught Father parenting and homemaking skills from January 2008 to March 2008.[14]  In addition to offering the testimony that she had offered during the first trial,[15] Barker testified during the second trial that when she revisited Father in July 2008, Father lived in a different apartment than he had lived in before.  She testified that this apartment was clean, that he had no pets, and that she looked around but did not see any animal feces or roaches or notice an overwhelming odor.

### c.  Nurse Donna Wright

In addition to providing the testimony that she had provided during the first trial,[16] Wright testified during the second trial that in July 2008, A.B. had language delays but no other developmental delays.  She testified that there are many reasons that a child can have language delays, including insufficient stimulation, trouble hearing, multiple ear infections, or neurological delays.  She testified that in her opinion, this inability to verbalize can frustrate a child, cause temper tantrums,

---

[13] *See id.*

[14] *See id.* at *8.

[15] *See id.* at *8–9.

[16] *See id.* at *14.

and cause behavioral problems that can jeopardize a child's physical or emotional well-being.

Wright next testified about H.B.'s October 2007 failure-to-thrive diagnosis, which she opined was caused by not being offered enough food. In addition to discussing the dates, weights, and percentages that she had addressed in the first trial, she added that H.B. was in the fiftieth percentile in weight on February 20, 2007, that she dropped to between the third and the fifth percentile by April 9, 2007, and to below the third percentile by May 3, 2007. She opined that a parent would notice such a drop but testified that H.B.'s doctors were not ready to make a failure-to-thrive diagnosis as of May 3, 2007, and that she, too, would have needed to run more tests at that time before making such a diagnosis.

Wright testified that H.B.'s physical or emotional health was endangered by her failure to thrive because it caused her to have a seizure. She testified that at the time of H.B.'s evaluation in July 2008, H.B. had language delays that "would have a potentially endangering effect on [her] physical or emotional wellbeing." Wright further testified that H.B. had motor skill developmental delays that could continue over time and affect her ability to get a job, to play sports, and to do physical labor, which Wright opined would also have a tendency to endanger H.B.'s well-being. Wright also testified that H.B.'s medical records noted "some concern about the development of [her] head and cranium." Wright explained that insufficient nutrition can inhibit brain cell growth and endanger a child's physical and emotional well-being and can do so permanently if it is not corrected.

24

#### d. Dr. Peter Lazarus

In addition to offering testimony similar to the testimony that he had offered during the first trial,[17] Dr. Lazarus testified during the second trial that he would have needed to do a history and physical exam, some preliminary tests, and a nutritional consult to rule out medical reasons before making a failure-to-thrive diagnosis in May 2007.

He testified that failure to thrive can lead to repeated infections or problems with psychosocial development—which includes "development anywhere from gross motor, fine motor, language skills, or social skills." He also testified that "[i]f those skills and that type of development [were] impeded, [that] would . . . pose a danger to a child's physical and emotional wellbeing" by keeping the child from meeting milestones.

He further testified that problems with head growth, which H.B. experienced when she was diagnosed with failure to thrive, could endanger a child's physical and emotional well-being by leading to retardation. When asked if H.B.'s failure to thrive could have led to retardation if her condition had gone untreated, Dr. Lazarus said that it could have led to development that was below what would be expected of her.

---

[17] *See id.* at *5.

25

### e. Jennifer

Jennifer, one of the children's initial foster parents, repeated during the second trial the testimony that she had offered during the first trial,[18] except that she did not state this time that H.B. had used profanity when she was two years old.

### f. Constance Burdick

In addition to repeating the testimony that she had offered during the first trial,[19] Burdick, a clinical social worker with Catholic Charities Diocese of Fort Worth, testified during the second trial that a psychologist had diagnosed Father with paranoia. When Father's attorney showed her Dr. Ryan's evaluation, Burdick stated that this evaluation, which she said was the most current evaluation, did not list paranoia as a diagnosis.

Also, Burdick testified that her clinical opinion in 2009 was that Father was "low functioning in insight and impulse control," which could endanger the physical or emotional well-being of one's child. She explained that a parent who was low functioning in insight would have difficulty knowing how to care for an ill child, an injured child, or a child with developmental problems. She also explained that parents with low impulse control would be more inclined to act spontaneously without thinking, to "smack a child," and to set a bad example for their children.

---

[18]*See id.* at *26–28.

[19]*See id.* at *19–20.

### g.  G.H.

In addition to repeating the testimony that he had offered during the first trial,[20] G.H. testified during the second trial that A.B. and H.B. were in kindergarten and pre-K, respectively, in an exemplary school district and that A.B. was in Indian Guides, which he enjoyed.  He testified that A.B. was considered "special needs" for speech language delays but that they worked with him a lot outside of school and that he was improving.  G.H. also testified about the children's daily routine and about the training that he and J.H. had to receive and maintain to be licensed foster parents.

G.H. testified again about Father's online activities but this time added that G.H. had found the profile page of a seventeen-year-old female who claimed to be in a relationship with Father and that some of the photos on her profile page depicted her with drug paraphernalia.

### h.  Father

#### *i*. Testimony Regarding Rains

In addition to repeating the same testimony that he had offered during the first trial,[21] Father testified during the second trial that the only other person who lived in his apartment or stayed overnight was Rains because she was due to have a baby in March 2011.  He explained that he was unsure who the father was because he

---

[20] *See id.* at *28.

[21] *Id.* at *1–4, 7–10, 16–23, 28–30, 32.

and Rains separated for about one month and that Jones, who spent some time at Father's apartment to protect Rains while Father was gone, could be the father. Father said that Rains was seeking to qualify for Social Security disability benefits but that he was unsure what disability she had.

Father testified that he did not know until after Rains became pregnant that she was on community supervision for injuring her grandmother. He said that he would still consider Rains to be a safe person for his children to be around if her actions toward her grandmother were out of protection for her child rather than out of pure anger toward her grandmother.

### ii. Testimony Regarding His Apartment

Father testified that his apartment was probably not as nice as J.H. and G.H.'s home but that it was the nicest apartment that he could afford. Father stated that his children were not living with him when Cornelius came to his apartment with Knox to make her initial reports or when the maintenance workers came to his apartment. He explained that he had not let Letz into his apartment because he and his attorney had agreed that anyone who wanted to see his apartment would have to obtain permission from his attorney to enter the apartment.

Father testified that he had a king-size bed with two twin mattresses underneath it that functioned as box springs and that he also had couches, an entertainment center with a TV and computer on it, and a computer table in the living room. He stated that he did not have a toddler bed or a crib yet but that he

could obtain those. Father testified that he had only one cat and never had more than one animal in the apartment that he began renting in June 2008.

### iii. Testimony Regarding Education and Income

Father testified that he had taken a few classes at Tarrant County Community College as recently as spring 2010 in pursuit of one of two computer degrees—information security technology or personal computer support. He testified that his cumulative grade point average in college was a 3.8 and that he planned on returning to classes when the TDFPS case was over.

Father stated that he could not remember what his last job was and that he continued to receive supplemental security income despite a psychiatrist telling him that he showed no signs of having a mental illness. He explained that the Social Security Administration had not done a review of his disability status since that psychiatrist's report. Father testified that his income consisted of his social security, food stamps, and the money that he earned from donating plasma. He said that he was not financially ready to have the children returned but that if the children were returned to him, his food stamps would increase from $360 to $400, which would be plenty of money.

Father testified that during a time period that included March 2010, he had an advertisement on his Myspace website for an adult website, an affiliated network, which he joined on September 28, 2007. He stated that he did whatever he could do to make money and that he got a percentage of the proceeds that the adult website made off his referrals.

### iv. Testimony Regarding TDFPS

Father testified that when Mother's family members were given possession of the children after H.B. was released from the hospital, Father only got to see the children one time over a two- or four-month period, and so he had to "bug and bug and bug" TDFPS to get visits at the TDFPS office. Father testified that he felt like he had to be aggressive, argumentative, and demanding toward TDFPS because they would not look at the facts and would not return his phone calls to give him an update or to tell him what to do next.

He testified that when he was permitted to take the children away from the TDFPS office for visits, the bus ride was so long that most of their time together was spent on the bus or at the park. He testified that he fed them during these visits but that he returned them dirty from their time at the park. He testified that he had to send e-mails, make phone calls, and file complaints to get his visits to last over four hours.

Father admitted that when he and the children were at the hospital after A.B. was injured, he was highly upset that TDFPS was investigating him again and that he did not act maturely toward them. Father testified that when he was released from jail after pleading guilty to injury to a child, he tried to contact his former caseworker, Ruth Groomer, about his service plan and had to call her many times, send her e-mails, and go "over her head" to get the service plan started. He testified that he retained an attorney, that his attorney filed a motion to compel, that the

service plan was put in place, and that he completed the service plan with the exception of the batterers' intervention class.

Father testified that he had a horrible relationship with Groomer and that he also had to call, e-mail, and go "over her head" repeatedly to set up visits with his children. He testified,

> [W]hen I tried to be calm and collected with them, you know, when I tried to do the right thing and leave a voicemail and wait for a call back, I would never get a call back. It was almost like, it is [Father], forget it; don't call him back. You know, it's like they blew me off every chance they got.
>
> The only way that I could actually get them to respond to me was to call and call and call and e-mail and e-mail, and make complaints.

Father stated that when he went to the TDFPS office for visits, he had words with Groomer because Groomer accused him of being a child abuser, thought he was a horrible person, did not treat him as a parent, and did not respect him. He admitted that he got into arguments with TDFPS personnel at the TDFPS office but that this did not occur each time and did not occur in front of the children.

Father testified that he filed several reports with TDFPS because he had genuine concern for the children's well-being, such as concerns that they were being pushed while they were in J.H. and G.H.'s care.

### *v.* Testimony Regarding H.B.'s Failure to Thrive

Father testified that he was small but not malnourished as a child and that he suffered from seizures as a child. He said that when he and Mother were together, H.B. was eating and doing everything that she was supposed to be doing. Father

said that from July 2007 until September 2007, he watched H.B. "a few times a week, but not on a consistent basis" but that when he cared for her, she ate normal table "scraps" like pizza or whatever he was eating along with milk or formula. Medical records admitted at both trials indicate that Mother's sister babysat the children while Mother was at work and that Father watched the children "sometimes" and on some weekends but not consistently.

Father testified that he was unable to get to the hospital to be with H.B. after her seizure until the following Monday because there was no bus transportation for him over the weekend but that he spent "[e]very single day, except for that Saturday and Sunday" at the hospital. He testified that he was not knowledgeable enough during the time that H.B. had her seizure but that he was now familiar with developmental goals and milestones of children. He also testified that in addition to taking the classes that were required by his service plan, he took a class called "Positive [B]rain [D]evelopment" on his own.

## II. Sufficiency Review of Endangerment Evidence

In his first and second points, Father argues that there is no evidence or factually insufficient evidence that he (1) knowingly placed or knowingly allowed A.B. and H.B. to remain in conditions or surroundings that endangered their physical or emotional well-being or (2) engaged in conduct or knowingly placed the children with

32

persons who engaged in conduct that endangered their physical or emotional well-being.[22]

## A. Burden of Proof and Standards of Review

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right."[23] In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit.[24] We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent.[25]

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best

---

[22]*See* Tex. Fam. Code Ann. § 161.001(1)(D), (E) (West Supp. 2012).

[23]*Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003).

[24]Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).

[25]*Holick*, 685 S.W.2d at 20–21; *In re R.R.*, 294 S.W.3d 213, 233 (Tex. App.—Fort Worth 2009, no pet.).

interest of the child.[26]  Both elements must be established; termination may not be

based solely on the best interest of the child as determined by the trier of fact.[27]

Termination decisions must be supported by clear and convincing evidence.[28]

Evidence is clear and convincing if it "will produce in the mind of the trier of fact a

firm belief or conviction as to the truth of the allegations sought to be established."[29]

Due process demands this heightened standard because termination results in

permanent, irrevocable changes for the parent and child.[30]

In evaluating the evidence for legal sufficiency in parental termination cases,

we determine whether the evidence is such that a factfinder could reasonably form a

firm belief or conviction that the grounds for termination were proven.[31]  We review

all the evidence in the light most favorable to the finding and judgment.[32]  We

resolve any disputed facts in favor of the finding if a reasonable factfinder could

---

[26]Tex. Fam. Code Ann. § 161.001 (West Supp. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

[27]*Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.T.*, 34 S.W.3d 625, 629 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh'g).

[28]Tex. Fam. Code Ann. § 161.001; *see also* § 161.206(a) (West 2008).

[29]*Id.* § 101.007 (West 2008).

[30]*In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

[31]*In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

[32]*Id.*

have done so.[33]  We disregard all evidence that a reasonable factfinder could have disbelieved.[34]  We consider undisputed evidence even if it is contrary to the finding.[35]  That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not.[36]

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province.[37]  And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable.[38]

In reviewing the evidence for factual sufficiency, we give due deference to the jury findings and do not supplant the verdict with our own.[39]  Here, we determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated subsection (D) or (E) of section 161.001(1).[40]  If, in

---

[33]*Id.*

[34]*Id.*

[35]*Id.*

[36]*Id.*

[37]*Id.* at 573, 574.

[38]*Id.* at 573.

[39]*In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

[40]Tex. Fam. Code Ann. § 161.001; *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient.[41]

When we reverse on factual sufficiency grounds, then we must detail in our opinion why we have concluded that a reasonable factfinder could not have credited disputed evidence in favor of its finding.[42]

## B. Law on Endangerment

"Endanger" means to expose to loss or injury, to jeopardize.[43]  It requires more than a mere threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment.[44]

To prove endangerment under subsection (D), TDFPS had to prove that Father (1) knowingly (2) placed or allowed his children to remain (3) in conditions or surroundings that endangered their physical or emotional well-being.[45]  Subsection (D) focuses on dangerous conditions or surroundings that endanger the physical or

---

[41]*H.R.M.*, 209 S.W.3d at 108.

[42]*J.F.C.*, 96 S.W.3d at 266–67.

[43]*Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see also In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996).

[44]*Boyd*, 727 S.W.2d at 533.

[45]*See* Tex. Fam. Code Ann. § 161.001(1)(D).

emotional well-being of the children.[46]  It focuses on the suitability of the children's

living conditions.[47]  Thus, under subsection (D), it must be the environment itself that

causes the children's physical or emotional well-being to be endangered, not the

parent's conduct.[48]

Under subsection (E), the relevant inquiry is whether evidence exists that the

endangerment of the children's physical well-being was the direct result of Father's

conduct, including acts, omissions, or failures to act.[49]  Additionally, termination

under subsection (E) must be based on more than a single act or omission; the

statute requires a voluntary, deliberate, and conscious course of conduct by the

parent.[50]  It is not necessary, however, that the parent's conduct be directed at the

children or that the children actually suffer injury.[51]  The specific danger to the

children's well-being may be inferred from parental misconduct standing alone.[52]  To

---

[46]*In re M.C.*, 352 S.W.3d 563, 566 (Tex. App.—Dallas 2011, no pet.).

[47]*Id.*

[48]*Id.*

[49]*In re M.C.T.*, 250 S.W.3d 161, 169 (Tex. App.—Fort Worth 2008, no pet.); *see* Tex. Fam. Code Ann. § 161.001(1)(E).

[50]*M.C.T.*, 250 S.W.3d at 169; *see* Tex. Fam. Code Ann. § 161.001(1)(E).

[51]*Boyd*, 727 S.W.2d at 533; *M.C.T.*, 250 S.W.3d at 168–69.

[52]*Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).

determine whether termination is necessary, courts may look to parental conduct occurring both before and after a child's birth.[53]

## C. Legal Sufficiency Analysis

As in the first trial, we first address whether the evidence is legally sufficient to support termination of Father's parental rights pursuant to subsection (D) or (E).[54]

Much of the same evidence that we considered to be legally sufficient to terminate Father's parental rights pursuant to subsection (D) and (E) in the first trial was admitted into evidence during the second trial.[55] Specifically, there was evidence that Father cared for H.B. to some extent around the time that she was diagnosed with failure to thrive due to malnourishment.[56] Thus, as it did last time, this evidence supports an inference that Father knew of and contributed to H.B.'s failure to thrive and, consequently, that Father endangered her by underfeeding her and knowingly allowed her to remain in a malnourished condition that endangered her.[57] Accordingly, viewing all the evidence in the light most favorable to the termination judgment and disregarding all contrary evidence that a reasonable factfinder could disregard, we again hold that some evidence exists that would

---

[53]*In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.).

[54]*See A.B.*, 2010 WL 2977709, at *35.

[55]*See id.*

[56]*See id.*

[57]*See* Tex. Fam. Code Ann. § 161.001(1)(D), (E); *A.B.*, 2010 WL 2977709, at *35–36.

support a factfinder's firm belief or conviction that Father violated subsections (D) and (E), and we overrule those portions of Father's first two points challenging the legal sufficiency of the evidence to support the termination of his parental rights on these two grounds.[58]

## D. Factual Sufficiency Analysis

As we did in the first opinion, we next address whether the evidence is factually sufficient to support termination of Father's parental rights pursuant to subsection (D) or (E).[59] We review all of the evidence, focusing on the evidence concerning the three allegations that TDFPS relies on as establishing subsections (D) and (E) grounds for termination: (1) H.B.'s failure-to-thrive diagnosis, (2) Father's hostile behavior, and (3) the conditions of Father's homes.[60]

### 1. Failure to Thrive

We concluded in our first opinion that the evidence relating to H.B.'s failure-to-thrive diagnosis was factually insufficient to terminate Father's parental rights under subsection (D) or (E) because a reasonable factfinder could not have formed a firm belief or conviction that Father underfed H.B. or knowingly allowed her to be underfed.[61]

---

[58] *See J.P.B.*, 180 S.W.3d at 573; *A.B.*, 2010 WL 2977709, at *36.

[59] *See A.B.*, 2010 WL 2977709, at *36.

[60] *See id.*

[61] *See id.* at *38.

### a. Knowledge

Most of the evidence from the first trial relating to Father's knowledge was also offered in the second trial—namely, EMT Chris Conner's testimony that H.B. did not appear to be emaciated and Father's testimony that Mother took H.B. to the doctor for her check-ups without Father, that he thought that H.B. was small because she took after him, and that he did not know that H.B. was failing to thrive.[62]  While Wright added in the second trial that a parent would have noticed H.B.'s drop from the fiftieth to below the fifth percentile in weight from February to April 2007, this is not evidence that Father knew that H.B. was failing to thrive. Indeed, the doctors did not even know at that point that H.B. was failing to thrive, and Wright and Dr. Lazarus both testified that they would have needed to conduct more tests before making such a diagnosis in May 2007.

Therefore, no additional evidence was admitted during the second trial to change our determination that the evidence is factually insufficient to support a finding that Father knew that H.B. was failing to thrive.[63]

### b. Conduct

As for Father's conduct, the evidence in the second trial does not show that Father had the children more often after he and Mother separated than the evidence

---

[62] *See id.*

[63] *See* Tex. Fam. Code Ann. § 161.001(1)(D); *C.H.*, 89 S.W.3d at 28–29; *A.B.*, 2010 WL 2977709, at *38.

in the first trial showed.[64]   Just as in the first trial, some evidence in the second trial

shows that Father had the children daily while Mother worked from 3:00 p.m. to

midnight, while other evidence shows that Father had the children only

"sometimes."[65]   And in the first appeal, we concluded that even if Father had the

children daily while Mother worked, the evidence was insufficient to terminate under

subsection (E).[66]   Also, as in the first trial, the evidence in the second trial shows

that when Father took care of H.B., he fed her table "scraps", such as pizza, along

with milk.

Therefore, no additional evidence was introduced during the second trial to

change our determination that the evidence is factually insufficient to show that

Father's conduct after he and Mother separated endangered H.B. by causing or

contributing to her failure to thrive.[67]

TDFPS appears to argue that because Father and Mother did not separate

until July 2007, Father had sufficient contact with H.B. during April and May 2007,

when H.B. was falling off the growth chart, to tie his conduct to her failure to thrive.

Indeed, evidence that Father had regular contact with H.B. and that H.B. was falling

---

[64] *See A.B.*, 2010 WL 2977709, at *38.

[65] *See id.* at *38 & n.71.

[66] *See id.* at *38–39.

[67] *See* Tex. Fam. Code Ann. § 161.001(1)(E); *C.H.*, 89 S.W.3d at 28–29; *A.B.*, 2010 WL 2977709, at *38–39.

off the growth chart during this time period was admitted in both trials.[68] However, there is no evidence in the appellate record of either trial that Mother and Father were not offering H.B. enough food at that time.[69] Instead, the only evidence in this regard is Father's testimony during the second trial that H.B. was eating normally when Mother and Father were together.

While the jury could have reasonably inferred the requisite conduct based on a diagnosis of failure to thrive due to malnutrition in April or May 2007, the jury did not have evidence of such a diagnosis.[70] Instead, the jury in the second trial had testimony from both Wright and Dr. Lazarus that they would have needed to conduct a series of tests before making a failure-to-thrive diagnosis at that time. Therefore, no additional evidence was introduced during the second trial to change our

---

[68] *See A.B.*, 2010 WL 2977709, at *3.

[69] *Cf. In re A.H.A.*, No. 14-12-00022-CV, 2012 WL 1474414, at *8 (Tex. App.—Houston [14th Dist.] Apr. 26, 2012, no pet.) (mem. op.) (noting that the children had been going through the garbage cans looking for food and that the mother admitted that rations tended to run very low toward the end of the month); *In re H.N.H.*, No. 02-11-00141-CV, 2012 WL 117861, at *2 (Tex. App.—Fort Worth Jan. 12, 2012, no pet.) (mem. op.) (stating that the mother endangered her child by failing to wake up in time to feed her child before the child left for school).

[70] *See In re S.H.A.*, 728 S.W.2d 73, 86 (Tex. App.—Dallas 1987, writ ref'd n.r.e.) (inferring that parents did not properly feed child, despite little direct evidence as to what foods they fed the child on a daily basis, when evidence included a diagnosis of failure-to-thrive caused by malnutrition).

determination that the evidence is factually insufficient to show that Father's conduct regarding H.B.'s nutrition before he and Mother separated endangered H.B.[71]

The main evidentiary difference between the first and second trials is that Wright and Dr. Lazarus supplemented their testimony during the second trial by addressing the ways in which A.B.'s and H.B.'s physical and emotional well-being had been endangered by their developmental delays. However, because there was no new evidence that these developmental delays were the direct result of Father's conduct,[72] or that Father knowingly placed or allowed his children to remain in conditions that endangered them, Wright's and Dr. Lazarus's testimony in this regard did not support termination under subsection (D) or (E).[73]

Accordingly, viewing all the evidence and affording due deference to the jury findings, we again hold that the evidence relating to H.B.'s failure-to-thrive diagnosis is factually insufficient to terminate Father's parental rights under subsection (D) or (E) because a reasonable factfinder could not have formed a firm belief or conviction that Father underfed H.B. or knowingly allowed her to be underfed.[74]

---

[71]*See* Tex. Fam. Code Ann. § 161.001(1)(E); *C.H.*, 89 S.W.3d at 28–29; *A.B.*, 2010 WL 2977709, at *38–39.

[72]*See M.C.T.*, 250 S.W.3d at 169.

[73]*See* Tex. Fam. Code Ann. § 161.001(1)(D), (E).

[74]*See id.*; *H.R.M.*, 209 S.W.3d at 108.

43

## 2. Hostile Behavior

In our first opinion, we held that the evidence of A.B.'s injuries was factually insufficient to terminate Father's parental rights under subsection (D) or (E).[75] Therefore, even if Father committed injury to a child—his criminal case was dismissed after he successfully completed deferred adjudication community supervision—TDFPS needed to offer additional evidence in the second trial to show that Father engaged in a continuing course of conduct that endangered his children's well-being.[76]

In the second trial, TDFPS did not show that Father had injured either of his children on another occasion. Indeed, Dr. Shaw, the Cook Children's Hospital emergency department physician who examined A.B. in July 2008, testified that A.B.'s skeletal survey showed no evidence of prior bone injuries and that he could not tell whether A.B.'s injuries happened at one time or at different times.

However, TDFPS argues that the incident involving A.B. is just one of many examples of Father's hostile and violent course of conduct toward others—namely, police officers and TDFPS caseworkers—under subsection (E).[77] TDFPS contends

---

[75]*See A.B.*, 2010 WL 2977709, at *37.

[76]*See M.C.T.*, 250 S.W.3d at 169.

[77]*See* Tex. Fam. Code Ann. § 161.001(1)(E); *M.C.T.*, 250 S.W.3d at 169.

44

that both the children's observation of this behavior and Father's inability to control or understand the effect of his behavior endangered the children's well-being.[78]

### a. Conduct toward Police Officers

The only new evidence admitted in the second trial regarding Father's conduct toward police officers is the testimony of Knox, the TDFPS investigator, that the children were present when Father cursed at the officers at Cook Children's Hospital. However, we could infer this fact when we addressed this issue in the first appeal, based on evidence from the first trial that the children were at the hospital and that Father was extremely loud.[79] Indeed, we noted in our first opinion that Brooks, the TDFPS investigator charged with investigating the July 2008 referral regarding A.B., described Father as "so aggressive and so loud and in your face" that on several occasions "people had to come in and tell him to be quiet or they were going to have him taken out of the hospital."[80] Brooks even testified that this behavior factored into her decision to remove the children that day.[81] Therefore, Knox's testimony about Father's conduct toward police officers was not new evidence to support termination under subsection (E).

---

[78] See Tex. Fam. Code Ann. § 161.001(1)(E).

[79] See A.B., 2010 WL 2977709, at *13 & n.31.

[80] See id. at *13 n.31.

[81] See id. at *13 & n.31.

45

### b. Conduct toward TDFPS

Father admitted in the second trial that he had a horrible relationship with Groomer and that after trying to go through the proper channels and then having to "bug" TDFPS by repeatedly calling, emailing, and going over Groomer's head, he felt like he had to be aggressive, argumentative, and demanding toward TDFPS for someone to give him an update or tell him what to do next. However, our first opinion addressed evidence of Father's behavior toward TDFPS personnel, evidence that the children witnessed his behavior, and evidence of how the children responded to such behavior.[82] Specifically, we described an instance in April 2009:

> Father came to a visit while he was very agitated, walked straight toward Groomer, started ranting and raving and shaking his finger in her face, waved his arms, and screamed at her. Father said that Groomer and the program director had lied to him about [TDFPS]'s plan for reunification. . . . Groomer said that Father stood over her screaming, would not sit down, and would not calm himself even after she and the security guard had requested that he calm down. The children retreated to a corner because they appeared to be afraid of him. Groomer became fearful for the children to be returned to Father and decided that [TDFPS] should terminate Father's parental rights. Groomer canceled Father's visitation for that day, and [TDFPS] did not give a make-up visit. Groomer testified that in her seven and a half years with [TDFPS], she had never seen anyone as upset as Father was. He was so upset that it made her fearful or anxious.[83]

In the first trial, we decided that such conduct was not evidence of endangerment under subsection (D) or (E).[84] Moreover, we recognized that Father's contention

---

[82] *See id.* at *21.

[83] *Id.*

[84] *See id.* at *40.

that various TDFPS workers had a vendetta against him was "somewhat supported by evidence in the record."[85]

The only new evidence in the second trial relevant to Father's conduct toward TDFPS caseworkers is evidence regarding the frequency of his outbursts toward them. Specifically, Trammell, the TDFPS aide who observed visitation, testified that Father would act out on virtually every visit from October 2008 to June 2009. However, it was apparent from the evidence in the first trial that Father acted this way on numerous occasions: Groomer had testified that two TDFPS employees were required to observe Father's visits and that this was appropriate because a guard had intervened in the visits several times due to Father's behavior.[86] Therefore, Trammell's testimony about the frequency of Father's outbursts toward TDFPS employees was not new evidence to support termination under subsection (E).

Because the second trial did not involve new evidence of Father's hostile conduct, evidence of Father's conduct will again be factually insufficient to support termination under subsection (E) absent new evidence that this conduct endangered the well-being of his children.[87]

---

[85]*Id.*

[86]*See id.* at *21.

[87]*See* Tex. Fam. Code Ann. § 161.001(1)(E).

### c. Endangerment

Knox testified in the second trial that the children's observations of Father's interactions with TDFPS endangered the children's well-being because it is detrimental for a child to observe emotional abuse in a domestic violence situation. Indeed, evidence of children's observations of domestic violence can be used to support a finding of endangerment.[88]  However, as Trammell confirmed, Father never directed his hostility toward his children during his TDFPS visits, and there is no evidence that he directed it toward Mother either.  While conduct need not be directed at the child to constitute endangerment,[89] Knox's testimony about the effects of domestic violence is not evidence that Father's behavior toward TDFPS endangered his children's well-being and therefore not evidence in support of termination under subsection (E).[90]

TDFPS contends that Father's expression of his frustration with TDFPS demonstrated low levels of impulse control, which endangered his children.  Indeed, we have held that an inability to control one's anger is some evidence of endangering conduct.[91]  And Burdick, the Catholic Charities social worker who

---

[88]*See, e.g.*, *In re C.J.O.*, 325 S.W.3d 261, 265–66 (Tex. App.—Eastland 2010, pet. denied); *In re M.R.*, 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.).

[89]*See J.T.G.*, 121 S.W.3d at 125.

[90]*See A.B.*, 2010 WL 2977709, at *36.

[91]*See In re J.G.K.*, No. 02-10-00188-CV, 2011 WL 2518800, at *40 (Tex. App.—Fort Worth June 23, 2011, no pet.) (mem. op.).

evaluated Father, testified that her 2009 report indicates that Father had low functioning levels of impulse control. However, Dr. Ryan, who evaluated Father in 2011, and Trammell both testified that Father was able to control his behavior. And, notably, Dr. Ryan did not even recommend anger management classes in 2011. Therefore, even showing due deference to the jury findings as we must, we cannot conclude based on the record that a reasonable jury could have formed a firm belief or conviction that Father's behavior toward others was evidence of an inability to control his anger that endangered his children under subsection (E).[92]

To the extent that TDFPS claims that Father's low levels of insight endangered his children, we reject this argument as well. Burdick determined in 2009 that Father had low levels of insight, and Dr. Ryan agreed but noted that Father's insight somewhat improved by 2011. Burdick testified that, in general, being low functioning in insight could have an endangering effect on the well-being of one's children. However, Dr. Ryan clarified that whether lack of insight endangers one's children depends on what the problematic behavior is, with illegal drug use being an example of a problematic behavior about which lack of insight could endanger a child. Dr. Ryan's report noted that everyone has problematic behavior, that Father did not use drugs or consume alcohol, and that Father's problematic behaviors were the disorders with which he had been diagnosed.

---

[92] *See C.H.*, 89 S.W.3d at 28–29.

49

As for Father's bipolar disorder, Dr. Ryan said that this disorder does not prevent someone from being a good parent, that Father's bipolar disorder was in partial sustained remission, and that Father did not present as a dangerous person. Similarly, there is also no evidence that Father's adjustment disorder in any way endangered the children; rather, Dr. Ryan diagnosed Father with this disorder and recommended counseling because of Father's separation from his children. The only medication that Dr. Ryan recommended was medication to treat Father's attention deficit disorder, and there is no evidence that this disorder, his chronic motor tick disorder, or his GAF score endangered his children's well-being. Because Dr. Ryan did not testify that Father's low level of insight exposed his children to injury,[93] and because Burdick merely testified about a threat of metaphysical injury,[94] a reasonable jury could not have formed a firm belief or conviction that Father's problem with understanding how his behavior affected others endangered his children's well-being.[95]

Accordingly, based on our review of the entire record and applying the appropriate standard of review, we hold that the evidence of Father's hostility is factually insufficient to support the termination of his parental rights under subsection (E) because a reasonable factfinder could not have formed a firm belief

---

[93] *See Boyd*, 727 S.W.2d at 533.

[94] *See id.*

[95] *See C.H.*, 89 S.W.3d at 28–29.

50

or conviction that Father's behavior toward others in front of his children or his low functioning levels of insight and impulse control endangered his children's well-being.[96]

### 3. Condition of Father's Homes

First, TDFPS points to the condition of Father and Mother's Missouri trailer. The scant evidence in the record regarding MDSS's first contact with the family in June 2005 is "6/26/05 Assessment for abrasions, unsanitary living conditions that was concluded Services needed linked initial 30 days." That brief reference does not provide any proof of unsanitary conditions. Further, there is no evidence that MDSS found that A.B. was in the trailer in December 2005 when MDSS found it to be unsanitary, without heat, and immediately threatening to A.B. Instead, as TDFPS recognizes, the evidence shows that Father, Mother, and A.B. were not staying in their trailer at the time but had moved to trailers that met MDSS's minimum standards.

As evidence of endangerment after the family moved to Texas, TDFPS points to Porter's depiction of the condition of Father's first apartment in October 2007. Porter testified that although Father was not home on October 9, 2007, she could smell a strong odor of animal feces coming from inside. Porter testified that the following day, she entered the apartment and smelled an odor of animal feces and urine, observed stains and animal excrement on the floor, saw bugs in areas of the

---

[96]*See* Tex. Fam. Code Ann. § 161.001(1)(E); *H.R.M.*, 209 S.W.3d at 108.

home including the refrigerator and the freezer, and noticed that the walls were ripped up.

While Porter testified that such an environment is dangerous to young children who put things in their mouths, Porter said that she did not know what the condition of Father's apartment was when the children were there, and there is no evidence of either child being at Father's apartment during this time period. Indeed, the evidence shows that Father was not even home from Monday, October 3, when the bus was able to take him to the hospital to see H.B., until Monday, October 10, when the bus, which did not operate on the weekend, was able to take him home after H.B.'s Sunday, October 8 release. Instead, the evidence suggests that this situation was much like the one in Missouri—one in which the animals nearly destroyed the home while the family was out of the home for an extended period of time and unable to return.

Furthermore, no evidence suggests that these same animal-related problems pervaded Father's home again. When Porter visited Father on October 10, Father told her that he had already contacted the city pound about his inability to take the animals anywhere without a car. And Father had only one pet, a cat, for which he had a litter box, by the time his children were returned on June 10, 2008, the day that he moved into his second apartment. Indeed, Father testified that he never had more than one animal in his second apartment.

TDFPS also points to Cornelius's testimony that she smelled a strong odor of animal feces in Father's apartment when she visited in October 2007. We note that

Cornelius also said that she could feel fleas biting her legs, that she saw roaches, and that she observed stains on the carpet and dirty water and dirty dishes in the dishwasher. Because no evidence suggests that the children lived in or visited Father's apartment in October 2007, though, neither Porter's nor Cornelius's testimony about the condition of Father's apartment at that time is evidence that the children were exposed to harm.[97]

While TDFPS does not mention this evidence, we note that TDFPS Investigator Cornelius testified in the second trial that during her visits to Father's apartment on June 17 and June 27, 2008, when the children were present, she saw "kind of old food" and trash on the floor. But like one of the witnesses in the first trial, Cornelius did not explain how the children would be harmed by the mess or clutter that she observed.[98] For instance, she did not testify that the children, who were in the bedroom with the door shut, were crawling around on the living room floor, had access to the food, were putting dangerously old food in their mouths, or were endangered by trash on the floor.[99] Therefore, like the witness's testimony in

---

[97] *See Boyd*, 727 S.W.2d at 533.

[98] *See A.B.*, 2010 WL 2977709, at *39.

[99] *Compare M.C.*, 917 S.W.2d at 270 (holding that the evidence of endangerment was legally sufficient when, in part, children ate food off the floor and out of the garbage), *with In re J.R.*, 171 S.W.3d 558, 573 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (holding that the evidence of endangerment was factually insufficient when, in part, the witness did not state what kind of knife she found on the floor, how long the knife had been there, or whether the children had access to it).

the first trial, Cornelius's testimony is not factually sufficient evidence of endangerment under subsection (D) or (E).[100]

TDFPS also points to the condition of Father's second apartment from September 28 to November 16, 2010. During that time period, Father received lease violations for unhealthy and unsanitary living conditions and for poor housekeeping, pest control instructed Father to clean his apartment before they would treat it for a roach infestation, and maintenance workers refused to make repairs in Father's apartment until he cleaned his floors. However, this evidence of the conditions during fall 2010 was not evidence that these conditions existed in Father's apartment when the children lived there in June and July 2008. Indeed, Coaxum testified that she had no record of unsanitary living conditions in Father's apartment during that time period. Because the children did not live in or visit Father's apartment during fall 2010 and had not done so for several months, evidence of the apartment's condition during fall 2010 was not evidence that the children were exposed to harm.[101]

Next, TDFPS points us to the testimony of Perez, who described Father's apartment from July to October 2009 as "generally cluttered" and "very unclean" and opined that Father's apartment was not an appropriate place for children to live "primarily because there [wa]s a very strong odor from the litter box." Also, Perez

---

[100]*See* Tex. Fam. Code Ann. § 161.001(1)(D), (E); *H.R.M.*, 209 S.W.3d at 108; *A.B.*, 2010 WL 2977709, at *39.

[101]*See Boyd*, 727 S.W.2d at 533.

noted that she detected the litter box odor as well as human body odor in January 2011.

We decided in our first opinion that evidence of Father's body odor is not evidence of endangerment under subsection (D) or (E).[102] And we need not decide whether there is a point at which the odor from a litter box becomes grounds for termination because Perez testified that the children did not live with Father at the time that she detected the odor. Therefore, Perez's testimony about the condition of Father's apartment is not evidence that the children were exposed to harm.[103]

Accordingly, applying the appropriate standard of review, we hold that evidence of the condition of Father's homes is factually insufficient to support termination of Father's parental rights under subsection (D) or (E) because a reasonable factfinder could not have formed a firm belief or conviction that the children were present in Father's homes when the unsanitary conditions were reported in 2007, 2009, 2010, and 2011 or that the children were endangered by the conditions that existed when they did live in the home in June and July 2008.[104]

---

[102]*See A.B.*, 2010 WL 2977709, at *40.

[103]*See Boyd*, 727 S.W.2d at 533.

[104]*See* Tex. Fam. Code Ann. § 161.001(1)(D), (E); *H.R.M.*, 209 S.W.3d at 108.

### 4. Other Evidence

#### a. Rains

The evidence shows that Rains, whom Father identified as his girlfriend and roommate, was convicted of committing bodily injury to an elderly person after injuring her grandmother while trying to protect her daughter. Father testified that his children would be safe around Rains, and Perez, the only other person who testified on this particular matter, said that she could not determine whether the children would be safe around Rains because Perez had never seen Rains interact with children. Without evidence that Rains would expose the children to injury, Rains's potential presence in Father's apartment upon the children's return is not evidence of endangerment under subsection (D) or (E).[105]

#### b. Online activities

Just as Father's involvement with adult websites did not factor into our decision in the first case, it does not factor into our decision in this case.[106] While new evidence of Father's online activities was introduced in the second trial, there is no evidence, just as there was not in the first trial, that the children were exposed to harm.[107] Without evidence that the children were exposed to any danger stemming

---

[105] *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E); *Boyd*, 727 S.W.2d at 533.

[106] *See A.B.*, 2010 WL 2977709, at *29–30.

[107] *See id.* at *29.

from Father's online activities,[108] this evidence is not evidence of endangerment under subsection (D) or (E).[109]

### 5. Conclusion

Applying the appropriate standard of review, the volume of disputed evidence—set forth extensively above—that a reasonable factfinder could not have credited in favor of subsection (D) or (E) findings is so significant that a factfinder could not reasonably have formed a firm belief or conviction of the truth of the allegations that Father violated subsection (D) or (E).[110] Therefore, the evidence is factually insufficient to support termination of Father's parental rights under subsection (D) or (E).[111] Accordingly, we sustain the remaining portions of Father's first and second points.

### III. Best Interest

In his third point, Father challenges the legal and factual sufficiency of the evidence to support the jury's finding that it was in his children's best interest to terminate his parental rights. Because we have concluded that the evidence is factually insufficient to support termination under subsection (D) or (E), we need not address whether the evidence to support the jury's best interest finding is factually

---

[108] *See Boyd*, 727 S.W.2d at 533.

[109] *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E).

[110] *See H.R.M.*, 209 S.W.3d at 108; *C.H.*, 89 S.W.3d at 28–29.

[111] *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E).

sufficient.[112] However, because a holding of legally insufficient evidence to support the jury's best interest finding would entitle Father to greater relief than he is afforded under our factual insufficiency holding, we shall address his contention that the evidence is legally insufficient to support the jury's best interest finding.[113]

Much of the same evidence that supported the best interest finding in the first trial was also admitted into evidence during the second trial.[114] Specifically, the evidence shows that the children exhibited developmental delays, especially A.B., who is considered "special needs." Additionally, the evidence questions Father's ability to provide minimally adequate healthcare, nutrition, and a safe physical home environment as well as his ability to understand his children's needs. The evidence also shows that Rains, who may very well live in Father's home upon the children's return, has a history of assaultive conduct. Additionally, the evidence shows that the children demonstrated physical and mental improvement while they were in foster care, that J.H. and G.H. provide the children with a safe, nurturing environment, that the children call J.H. and G.H. "[M]ommy" and "[D]addy," and that J.H. and G.H. would like to adopt the children if Father's parental rights are terminated.

---

[112]*See* Tex. R. App. P. 47.1.

[113]*See A.B.*, 2010 WL 2977709, at *41.

[114]*See* Tex. Fam. Code Ann. § 263.307(b) (West 2008); *A.B.*, 2010 WL 2977709, at *42.

Therefore, viewing the evidence in the light most favorable to the judgment, we hold, as we did in our first opinion, that the evidence is legally sufficient to support the jury's best interest finding.[115]  We overrule Father's third point.

## IV.  Intervention

In his fourth point, Father claims that the trial court erred by allowing G.H. and J.H. to intervene in the termination suit because (1) they should not have been able to gain standing after the trial court wrongfully terminated his parental rights and (2) intervention by foster parents violates a parent's due process rights.  As we have previously explained,

> The standard of review for determining whether the trial court improperly denied a motion to strike intervention is abuse of discretion. To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable.

> In 1995, the Texas Legislature passed new laws specifically implicating the ability of foster parents to be heard in trial court regarding their foster children.  Foster parents now have two avenues to the courthouse.  First, foster parents can bring an original suit affecting the parent child relationship (SAPCR) if the child has lived with the foster parents "for at least [twelve] months ending not more than [ninety] days preceding the date of the filing of the petition."  Tex. Fam. Code Ann. § 102.003(a)(12) (Vernon Supp.20[12]).

> Second, foster parents who have not had possession of the child for at least twelve months ninety days before they file suit may nevertheless intervene in a SAPCR brought by someone with standing if the foster parents can demonstrate that they have had substantial past contact with the child.  *Id.* at § 102.004(b).

---

[115]*See* Tex. Fam. Code Ann. § 263.307(b); *J.P.B.*, 180 S.W.3d at 573; *A.B.*, 2010 WL 2977709, at *42.

The substantial past contact test established by section 102.004(b) for foster parent intervenors was a dramatic change from the traditional intervenor standing requirement. For several years, the Texas Supreme Court case of *Mendez v. Brewer* dominated the jurisprudence of when foster parents could intervene in termination proceedings. In *Mendez*, foster parents planning on adopting the child if parental rights were terminated sought to intervene in a termination suit. The court looked to [former] section 11.03 of the Texas Family Code, which . . . read: "A suit affecting the parent-child relationship may be brought by any person with an interest in the child." Based on this statute, the court in *Mendez* established a "justiciable interest" standard for intervenors. Applying this standard to the foster parents, the *Mendez* court held that their interest was wholly contingent on the outcome of the termination suit—an interest that was too weak to be justiciable.

Since *Mendez*, however, the Texas Legislature has passed section 102.004, which, as discussed above, creates the new, more relaxed substantial past contact test for establishing intervenor standing in a SAPCR. Thus, a party who cannot *file* a SAPCR under the *Mendez* "justiciable interest" standard may nonetheless *intervene* in a suit filed by a qualified party under the statutory "substantial past contact" standard.

Sound policy supports the relaxed standing requirements. There is a significant difference between filing a suit which could disrupt the children's relationship with their parents, and intervening in a pending suit, where the relationship is already disrupted. In the latter case, intervention may enhance the trial court's ability to adjudicate the cause in the best interest of the child.

Other courts have evaluated cases in which foster parents sought to intervene in termination proceedings. In one case, a seventeen-month-old child had lived with the foster parents for fourteen months of her life. The foster parents had decided to adopt the child if the mother's parental rights were terminated. The appellate court held that, under section 102.004, the trial court did not abuse its discretion in allowing the foster parents to intervene in the termination suit because the foster parents had had substantial past contact with the child.

The foster parents in this case had two avenues to be heard by the court—either as petitioners or intervenors. N.L.G. came to the foster parents in April 2005 and continuously remained with them

through the termination hearing in September 2006. Therefore, under section 102.003(a)(12), the foster parents could have brought an original suit affecting the parent-child relationship concerning N.L.G.

The foster parents in this case, however, chose the second method available to them as intervenors in the suit brought by the State. As intervenors, the foster parents had to provide the trial court with grounds for a finding of substantial past contact with N.L.G. At the time of the hearing on Sarah's motion to strike, the child had lived with the foster parents for her entire life, excluding the first seven days following her birth. Furthermore, the foster parents had become emotionally attached to the child and had decided to adopt her if Sarah's parental rights were terminated. The intervenors made the trial court aware of these facts through their motion to intervene and the hearing on that motion.[116]

Father argues that our reversal of the first termination order should somehow cancel out all but three and a half months of the time that that the children have been with G.H. and J.H.; that is, he argues that the trial court should not have considered the eighteen-month period from June 8, 2009, when the first trial began, until December 9, 2010, when G.H. and J.H. intervened, in deciding the standing issue.

We decline to invade the province of the legislature by injecting new requirements into the statute.[117] We also reject Father's arguments portraying this case as a dispute between parents and foster parents and neglecting the policy of

---

[116]*In re N.L.G.*, 238 S.W.3d 828, 829–31 (Tex. App.—Fort Worth 2007, no pet.) (selected citations omitted).

[117]*See Atmos Energy Corp. v. Cities of Allen*, 353 S.W.3d 156, 162 (Tex. 2011).

acting in the children's best interest.[118]

Finally, Father's argument ignores the trial court's order in the first trial naming TDFPS as the children's permanent management conservator (PMC) and the related findings that "the appointment of either parent as Managing Conservator would not be in the best interest of the children because the appointment would significantly impair [their] physical health or emotional development" and that the appointment of TDFPS would be in the children's best interest. Neither the findings nor the designation of TDFPS as the children's PMC was disturbed by our first opinion.[119] Because TDFPS placed the children in G.H. and J.H.'s care and left them in that foster home after being designated their PMC, there is no taint on the period of more than twenty one-months that G.H. and J.H. fostered the children before intervening in the termination suit. We hold that the trial court did not abuse its discretion by considering all the time the children have been with G.H. and J.H. and allowing the intervention.

As to Father's due process argument, we find our sister court in Tyler's analysis instructive:

> [The parents] contend that [former] Chapters 11 and 15 of the T[exas] F[amily] C[ode] violate the constitutionally protected right to integrity of the family insofar as they allow a party other than the state to seek the termination of the natural parents' parental rights.

---

[118] *See N.L.G.*, 238 S.W.3d at 830.

[119] *See In re J.A.J.*, 243 S.W.3d 611, 612–13 (Tex. 2007).

The right to marry, to establish a home and bring up children is a fundamental liberty interest protected by the fourteenth amendment. The natural parents' fundamental liberty interest in the care, custody and management of their child is not lost because they have not been model parents or have lost temporary custody of their child to the state. A compelling governmental interest must exist in order to justify state interference with the parent-child relationship. The appellants maintain that there is no compelling state interest that would allow parties other than the state to seek a termination of parental rights.

The compelling state interest at stake in parental rights termination proceedings is a *parens patriae* interest in preserving and promoting the welfare of the child. It is undoubtedly true that the *parens patriae* interest favors preservation, not severance, of natural familial bonds. Although favoring the preservation of the natural familial bond, it does not mandate such a result where clear and convincing proof shows that this would not be in the best interest of the child. The determination of what is in the child's best interest requires a fact finding by procedures that promote an accurate determination of whether the natural parents can and will provide an adequate and stable home.

When a conflict arises between the individual's protected interest under the fourteenth amendment and the countervailing compelling state interest, the individual is protected by the due process guarantee of the amendment. But in a case, such as this one, in which due process unquestionably applies, the question remains what process is due. Due process is flexible and calls for such procedural protections as the particular situation demands. The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner." "All that is necessary is that the procedures be tailored, in light of the decision to be made, to 'the capacities and circumstances of those who are to be heard.'" In *Mathews*, the Supreme Court set out three factors which must be considered in identifying the specific dictates of due process.

> First, the private interest that will be affected by official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and

63

administrative burdens that the additional or substitute procedural requirement would entail.

In arguing that the state must show a compelling interest to allow suits for termination by persons other than the state, the appellants confuse the nature of the private, protected interest entitled to due process protection with a procedural characteristic of the Texas process. Clearly, there need not be a compelling state interest for each detail of the process due. In our view, the provision for suits for termination by persons "whom the court determines to have had substantial past contact with the child sufficient to warrant standing to do so" does nothing to diminish the appellants' due process protection. Many states give standing to persons other than the state to bring termination suits. Foster parents have standing to bring such actions in at least eight other states. Texas courts have long recognized that parental custodial rights come within the protection of the due process clauses of the federal and state constitutions. "In cases of this kind the question of the fairness of the hearing is always present and has been jealously guarded by the courts." The state's right to intervene to protect dependent or neglected children was recognized long before the advent of state supported child welfare agencies. Before the passage of the F[amily] C[ode], under the statutes pertaining to dependent and neglected children, private persons customarily initiated suits to declare a child dependent and neglected. Common sense argues that the fairness and accuracy of the fact-finding process would be served by granting standing to those among the most intimately concerned with the child's welfare.

The appellants were provided counsel and interpreters, a trial of the issues in which the burden of proof borne by their adversaries was by a clear and convincing evidence standard. The foster parents were required to prove not only the best interests of the child, but also the natural parents' misconduct. In this case, the natural parents were extensively helped by TDHS in an attempt to improve their marginal child rearing capabilities. The appellants' due process rights were not violated by the procedure provided by the T[exas] F[amily] C[ode].[120]

Like the birth parents in *Rodarte*, Father had appointed counsel and a jury trial

---

[120]*Rodarte v. Cox*, 828 S.W.2d 65, 79–80 (Tex. App.—Tyler 1991, writ denied) (citations omitted).

in which the appellees had the burden of proving the grounds for termination by clear and convincing evidence. We therefore likewise hold that allowing the foster parents to intervene did not violate Father's rights to due process.

Further, unlike *Rodarte*, Father has been successful on appeal. Our reversal of this second termination order removes the foster parents as joint managing conservators because the trial court did not make independent conservatorship findings in this order.[121] Thus, Father is in exactly the position he was in before the intervention—TDFPS is the PMC of the children and has placed them with G.H. and J.H. Consequently, even if the intervention had violated Father's rights to due process, he can show no harm. We overrule Father's fourth issue.

### V. Impeachment

In his fifth point, Father argues that the trial court erroneously denied him the right to fully cross-examine Burdick by preventing him from impeaching her regarding her bias against him. Specifically, Father argues that the trial court gave the jury a false impression and violated his right to a full cross-examination by redacting from Burdick's report her mention of his polygraph examination and her comment that he wasted his money by obtaining a polygraph examination. But Father agreed to and the trial court granted a motion in limine that prohibited "[a]ny reference to polygraph results or the taking of a polygraph examination." He therefore cannot now complain of the exclusion of the polygraph evidence on

---

[121]*See In re D.N.C.*, 252 S.W.3d 317, 319 (Tex. 2008).

65

appeal.[122]

Accordingly, we overrule Father's fifth point.

## VI. Conclusion

Having determined that the evidence is factually insufficient to terminate Father's parental rights under subsections (D) and (E) of section 161.001(1) of the family code and having overruled his other points, we reverse the trial court's judgment and remand the case to the trial court for a new trial.

LEE ANN DAUPHINOT
JUSTICE

PANEL: DAUPHINOT, WALKER, and MCCOY, JJ.

MCCOY, J., dissents without opinion.

DELIVERED: September 13, 2012

---

[122] *See In re A.S.Z.*, No. 02-07-00259-CV, 2008 WL 3540251, at *2 (Tex. App.—Fort Worth Aug. 14, 2008, no pet.) (mem. op.); *McLendon v. McLendon*, 847 S.W.2d 601, 609 (Tex. App.—Dallas 1992, writ denied) (holding that because father agreed to the omission of specific periods of possession, he cannot complain on appeal that the failure to grant him specific terms is reversible error).